# CIRCUIT COURT OF THE CITY OF CHESAPEAKE

City of Chesapeake

v.

Southeastern Public Service
Authority of Virginia

28 September 2006

Case No. (Civil) CL06-1876

BY JUDGE V. THOMAS FOREHAND

This matter is before the Court on Southeastern Public Service Authority's ("SPSA") Demurrer to Counts I and II, SPSA's Special Plea of Collateral Estoppel, and the City of Chesapeake's ("Chesapeake" or "City") request in Count V of the Complaint for preliminary injunctive relief. The Court has carefully considered all pleadings, motions, and exhibits before the Court, all briefs submitted by counsel, and counsels' oral arguments.

*Facts Alleged in Chesapeake's Complaint*

SPSA was formed under the Virginia Water and Waste Authorities Act, and operates under Articles of Incorporation adopted on January 24, 1973, and amended on January 15, 1976, and July 15, 1983. Chesapeake is a member of SPSA along with the Cities of Franklin, Norfolk, Portsmouth, Suffolk, and Virginia Beach and the Counties of Isle of Wight and Southampton. Each member has equal representation on the SPSA Board of Directors; however, members do not share equal financial responsibilities. Pursuant to the Articles of Incorporation, the purpose of SPSA is to acquire, finance, construct, operate, and maintain a water system and a garbage and trash collection and disposal system pursuant to the Virginia Water and Sewer Authorities Act.

Chesapeake entered into an Agreement for Use and Support of a Solid Waste Disposal System ("Use and Support Agreement") with SPSA on August 9, 1983, which was amended on September 28, 1988, to extend the term of the agreement to January 24, 2018. The Use and Support Agreement "purports to ensure delivery of all or substantially all of the 'disposable solid waste' generated or collected by or within or under the control of [Chesapeake] to SPSA facilities." (Complaint ¶ 10.) SPSA charges Chesapeake "tipping fees" based on tonnage of delivered disposable solid waste. The Use and Support Agreement requires SPSA to accept and dispose of the City's delivered disposable solid waste by means of a "safe, sanitary, and environmentally sound solid waste disposal system." The Use and Support Agreement provides that the SPSA solid waste disposal system is established and operated in two phases: (1) A regional landfill located in the City of Suffolk ("Suffolk Landfill") and operated by SPSA; and (2) a refuse derived fuel processing plant ("RDF Plant") located in the City of Portsmouth and operated in conjunction with the Suffolk Landfill.

*Count I of the Complaint*

In Chapter 596 of the 2000 Acts of Assembly, the General Assembly extended the life of SPSA indefinitely, but also created a mechanism for member localities to withdraw from SPSA at any time, without regard to any outstanding bonds issued by SPSA. Specifically, Chapter 596 states: "[A]ny locality which is a member of the Southeastern Public Service Authority of Virginia may withdraw therefrom, whether or not there are any outstanding bonds of the Southeastern Public Service Authority of Virginia; provided, however, that all *written obligations to the Southeastern Public Service Authority of Virginia* incurred by a locality while the locality was a member shall remain in full force and effect following the locality's withdrawal." 2000 Va. Acts, ch. 596, § 2 (emphasis added).

Chesapeake alleges that the General Assembly "intended to limit the phrase 'written obligations' to written financial instruments such as bonds, indentures, and notes," (Complaint ¶ 17) and that the City will not remain liable under the Use and Support Agreement after its withdrawal from SPSA because the Use and Support Agreement is not a "written obligation" as contemplated by the General Assembly. (Complaint ¶ 16.)

*Standard of Review on Demurrer*

"A demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof." *Glazebrook v. Board of Supervisors of Spotsylvania County*, 266 Va. 550, 554, 587 S.E.2d 589, 591 (2003). Further, a demurrer "admits the truth of the facts contained in the pleading to which it is addressed, as well as any facts that may be reasonably and fairly implied and inferred from those allegations. A demurrer does not, however, admit the correctness of the pleader's conclusions of law." *Taboada v. Daily Seven, Inc.*, 271 Va. 313, 317, 626 S.E.2d 428, 429 (2006); *Harris v. Kreutzer*, 271 Va. 188, 195, 624 S.E.2d 24, 28 (2006). To survive a challenge by demurrer, a "pleading must be made with 'sufficient definiteness to enable the court to find the existence of a legal basis for its judgment'." *Eagle Harbor, L.L.C. v. Isle of Wight County*, 271 Va. 603, 611, 268 S.E.2d 298, 302 (2006) (quoting *Moore v. Jefferson Hospital, Inc.*, 208 Va. 438, 440, 158 S.E.2d 124, 126 (1967)). A trial court is "not permitted on demurrer to evaluate and decide the merits of the allegations set forth in a [Complaint], but only may determine whether the factual allegations of the [Complaint] are sufficient to state a cause of action." *Harris*, 271 Va. at 195–96, 624 S.E.2d at 24 (quoting *Riverview Farm Assocs., Va. Gen. P'ship v. Board of Supervisors*, 259 Va. 419, 427, 528 S.E.2d 99, 103 (2000)).

*SPSA's Demurrer to Count I of the Complaint*

"SPSA does not dispute the City's right to withdraw"; however, SPSA demurs to Count I to the extent that it is based on Chesapeake's contention that the Use and Support Agreement is not a "written obligation" of the City or that the City has no obligation to honor the Use and Support Agreement. SPSA asserts that the "city has failed to allege facts to support its contention that it need not honor the Use and Support Agreement." (Demurrer ¶ 1.)

Clearly, the Use and Support Agreement is "written"; thus, the next issue for the Court to consider is whether the Use and Support Agreement falls within the General Assembly's intended meaning of the term "obligations." Under basic rules of statutory construction, a court must "consider the language of a statute to determine the General Assembly's intent from the plain and natural meaning of the words used." *Alcoy v. Valley Nursing Homes, Inc.*, 272 Va. 37, 41, 630 S.E.2d 301, 303 (2006). "The plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction." *Melanson v. Commonwealth*, 261 Va. 178, 183, 539 S.E.2d 433, 435 (2001).

*Black's Law Dictionary* notes that, as a legal term, the word *obligation* "originally meant a sealed bond, but . . . now extends to any certain written promise to pay money or do a specific thing." *Obligation* is further defined as "that which a person is bound to do or forbear; any duty imposed by [a] law, promise, [or] contract . . . . [A] law or duty binding parties to perform their agreement. An undertaking to perform. That which constitutes a legal or moral duty and which renders a person liable to coercion and punishment for neglecting it; a word of broad meaning, and the particular meaning intended is to be gained by consideration of its context." *Black's Law Dictionary*, 1074 (6th ed. 1990) (internal citations omitted).

It is an elementary proposition that obligations can arise from contracts. Contracts, by their very nature, create rights and obligations among the parties that draft and sign them. References to contract obligations in statutory and case law are almost innumerable. *See, e.g.*, Va. Const., art. I, § 11 ("the General Assembly shall not pass any law impairing the *obligation* of contracts.") (emphasis added); Va. Code § 8.1-201(b)(12) (" 'Contract,' as distinguished from 'agreement,' means the total legal *obligation* that results from the parties' agreement . . . .") (emphasis added); *Domino's Pizza, Inc. v. McDonald*, 126 S.Ct. 1246, 1250 (2006); *Seaboldt v. Pennsylvania RR.*, 290 F.2d 296, 298 (1961) ("simply, as a matter of contract, creates the *obligation*. . . .") (emphasis added); *Harrison & Bates, Inc. v. Featherstone Assocs., Ltd. P'ship.*, 253 Va. 364, 372–72, 484 S.E.2d 883, 887 (1997).

To hold that the term "written obligations" is limited to "written financial instruments such as bonds, indentures, and notes" as proposed by Chesapeake would require a "curious, narrow, [and] strained construction." *Melanson*, 261 Va. at 183, 539 S.E.2d at 435. The Court is of the opinion that Count I of the Complaint fails to state a cause of action, because the Use and Support Agreement entered into between SPSA and Chesapeake clearly falls within the "plain, obvious, and rational meaning" of the term "written obligations" found in Chapter 596 of the 2000 Acts of Assembly. Therefore, SPSA's Demurrer to Count I of the Complaint is sustained with prejudice.

### Count II of the Complaint

Chesapeake alleges that, as "construed by SPSA, the Use and Support Agreement requires the City to effectively remain a member of SPSA despite withdrawal." (Complaint ¶ 22.) Chesapeake argues that SPSA has engaged in activities that are in "derogation of the City's duty and authority to protect the public health, safety, and welfare." Such activities include "entering into a Non-Disclosure Agreement with Waste Industries of America, Inc., to negotiate for

use of, or investment in, a municipal solid waste landfill in Camden County, North Carolina. Chesapeake adamantly opposes the landfill on the grounds that it poses a direct threat to a primary component of its drinking water supply." (Complaint ¶ 23.) Chesapeake made findings by a resolution adopted April 12, 2005, that the "Camden County landfill will be adverse to the public health, safety, and welfare of the citizens of Chesapeake." (Complaint ¶ 26.) Chesapeake asserts that, "[b]y remaining a member of SPSA and continuing to deliver solid waste to SPSA under the Use and Support Agreement, the City is effectively stripped of its ability to exercise police powers to protect the public health, safety, and welfare of its citizens and could be forced to participate in actions that will harm the City's drinking water, degrade air quality, and endanger the safety of motorists on the City's roads." (Complaint ¶ 27.) Chesapeake alleges that the Use and Support agreement is void against public policy because it deprives the City of its ability to protect the public health, safety, and welfare. (Complaint ¶ 28.) Chesapeake also alleges that SPSA currently has negative assets and continues to incur new debt, forcing the City to participate in the loss and waste of public funds in violation of public policy. (Complaint ¶ 29.)

*SPSA's Demurrer to Count II of the Complaint*

SPSA demurs to Count II of the Complaint on the grounds that it fails to state a cause of action as there is no justiciable case or controversy, in that, the "City has made no allegations to support its contention that, by honoring the Use and Support Agreement, the City is in any way 'stripped of its ability to exercise police power to protect the public health, safety, and welfare of its citizens'." (Demurrer ¶ 2.)

In *Concerned Residents of Gloucester County v. Board of Supervisors of Gloucester County*, 248 Va. 488, 449 S.E.2d 787 (1994), Concerned Residents sought to have the trial court declare "unconstitutional, unlawful, and invalid" a contract entered into between the Board of Supervisors of Gloucester County and Waste Management Disposal Services of Virginia, Inc. *Id.* at 490, 449 S.E.2d at 789. The contract in *Concerned Residents* provided, *inter alia*, that Gloucester County would acquire a suitable property for a solid waste management facility and that Waste Management, a private company, would reimburse the County for the acquisition costs. The County would then retain ownership of the property and would lease the property to Waste Management for a term of twenty years. Under the contract, Waste Management would construct and operate a solid waste disposal facility on the property and would pay Gloucester County a "Guaranteed Annual Rent" of $50,000, which could be

increased based on the tonnage of solid waste delivered to the facility. The trial court sustained the defendants' demurrers and dismissed the bill of complaint with prejudice, holding that the contract did not violate any constitutional or statutory provisions. *Id.* at 491, 449 S.E.2d at 789. Concerned Residents appealed, arguing, in part, that the contract was illegal because it bound future boards of supervisors, "thus interfering with the ability of future Boards to exercise their legislative discretion, and that, therefore, the contract restricted "unconstitutionally the future prerogatives of boards of supervisors" and constituted "a bartering away of legislative powers." *Id.* at 491–92, 499, 449 S.E.2d at 789, 794.

In *Concerned Residents*, the Supreme Court of Virginia recognized that it is a "firmly established" principle in Virginia that a locality is "capable of contracting and has the power to make all contracts which are proper and reasonably necessary to the execution of its corporate objects and purposes." *Id.* at 499, 449 S.E.2d at 794 (quoting *South Hampton Apts. v. Elizabeth City Co.,* 185 Va. 67, 79, 37 S.E.2d 841, 847 (1946)). The Court further stated that the legislative intent of Virginia Code §§ 15.1-28.01 and 15.1-28.02 (now Va. Code §§ 15.2-931 and 15.2-932 respectively) authorizing localities to contract for the collection and disposal of waste "could not be more clear." *Concerned Residents of Gloucester,* 248 Va. at 500, 449 S.E.2d at 794; *Concerned Taxpayers v. County of Brunswick,* 249 Va. 320, 331, 445 S.E.2d 712, 718 (1995) ("Local governing bodies are expressly authorized to enter into contracts relating to waste disposal facilities."); *see Mumpower v. Housing Auth. of the City of Bristol,* 176 Va. 426, 444, 11 S.E.2d 732, 739 (1940) ("The best indications of public policy are to be found in the enactments of the Legislature."). In reaching its decision, the Supreme Court noted:

> Where, as here, the General Assembly has authorized the County "to provide for the health and safety of its citizens . . . and to promote the general health and welfare by providing for adequate [waste] disposal services," action taken by the County in response thereto is a legislative act in the furtherance of the County's police powers. When a legislative body exercises its police powers, every possible presumption shall be indulged in favor of the validity of its legislative act. Additionally, we emphasize that, in deciding whether a legislative act is valid, a court is not concerned about whether the action is wise.

*Concerned Residents of Gloucester*, 248 Va. at 493–94, 449 S.E.2d at 790 (internal citations omitted).

The Supreme Court held that Gloucester County had "entered into a twenty-year lease with Waste Management." *Id.* at 500, 449 S.E.2d at 794. "When the General Assembly has made an express grant of power to a county without prescribing the method of execution, the county is permitted to utilize its discretionary authority in exercising the granted power, provided the selected method is reasonable." *Id.* (citing *Commonwealth v. Arlington County Bd.*, 217 Va. 558, 574, 232 S.E.2d 30, 40 (1977)). The Court further found nothing in the method selected by the County in exercising the granted power to be unreasonable or to have constituted a "bartering away of the County's legislative powers" and, therefore, affirmed the judgment of the trial court. *Id.*

In the instant case, Chesapeake utilized its discretionary authority in exercising the granted power to contract for the collection and disposal of waste by electing to become a member of SPSA at its inception and by entering into the Use and Support Agreement with SPSA some twenty-three years ago. The Court is of the opinion that Count II of the Complaint fails to state a cause of action, in that nothing in the method selected by Chesapeake in exercising the granted power is unreasonable and the Use and Support Agreement neither deprives the City of its ability to protect the public health, safety, and welfare, nor illegally barters away Chesapeake's legislative powers. Therefore, SPSA's Demurrer to Count II of the Complaint is sustained with prejudice.

Based on the Court's rulings on SPSA's Demurrer to Counts I and II of the Complaint, the Court need not reach the issues raised in SPSA's Special Plea of Collateral Estoppel regarding the validity of or Chesapeake's obligations under the Use and Support Agreement; further, Chesapeake's motion for Preliminary Injunctive Relief is denied.